IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:06CR474 |
| | ) | |
| RODNEY ANTON WILLIAMSON | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the court following a hearing on remand from the Fourth Circuit to determine whether the Government violated Defendant Rodney Anton Williamson's Fifth Amendment rights by surreptitiously recording—and later using at trial—statements Mr. Williamson made to a co-conspirator informant on January 29, 2007, after Mr. Williamson had been indicted. For the reasons stated below, the evidence does not demonstrate that a Fifth Amendment violation occurred.

I.

On December 18, 2006, a grand jury returned a sealed indictment charging Mr. Williamson and six co-defendants with conspiracy to distribute five kilograms or more of cocaine hydrochloride. A warrant for Mr. Williamson's arrest was issued the day following the indictment. In January 2007, Edison Alberty, Mr. Williamson's acquaintance and co-conspirator, contacted federal authorities and sought to cooperate as an informant. Mr. Alberty had "worked for" another co-conspirator named in the indictment, Christopher "Seth" Swaney, and also

regularly obtained cocaine from Mr. Williamson during and after Mr. Swaney's incarceration in 2006. Alberty Trial Tr. Vol. II at 179-185 (Aug. 16, 2007) (Dock. # 226).

Mr. Alberty arranged to meet with Mr. Williamson at a restaurant in Greensboro on January 29, 2007. Id. at 188-191. Mr. Alberty and Mr. Williamson had planned to meet in order to set up a subsequent drug deal, and also to discuss concerns about Mr. Swaney's arrest and indictment.[1] Id. at 191; Alberty Hearing Tr. at 27-28 (Oct. 13, 2011) (Dock. # 290). Though Mr. Alberty agreed to wear a recording device during the meeting, the agents working with Mr. Alberty did not ask him to do so until the day of the meeting. Bryant Hearing Tr. at 18 (Oct. 13, 2011) (Dock. # 290). At that time, government agents had not told Mr. Alberty of the sealed indictment (or that Mr. Williamson was named on the indictment), the pending arrest warrant for Mr. Williamson, or their plan to arrest Mr. Williamson after the meeting.[2] Alberty Hearing Tr. at 26 (Oct. 13, 2011) (Dock. # 290). The

---

[1] As of January 29, the indictment had been unsealed as to several named defendants. Mr. Williamson told Mr. Alberty that he had a "list" of names that appeared on the indictment and that Mr. Swaney was listed, along with Louis Odain Rabsatt and Rasheed Elridge Creque. Joint Appendix at 333, United States v. Williamson, No. 08-4055 (Dock. # 42) (4th Cir. Nov. 26, 2008). Mr. Williamson expressed surprise that his name was not on the indictment, stating, "why they ain't got me I don't know," and speculated that authorities "ain't been looking for me." Id. at 353-54. Mr. Alberty and Mr. Williamson also discussed, however, Mr. Swaney's observation that some names on the indictment had been "whited out." Id.; Alberty Hearing Tr. at 45 (Oct. 13, 2011) (Dock. # 290).

[2] Mr. Alberty heard of the indictment from Mr. Swaney and Mr. Williamson, and did not discuss it with law enforcement. Alberty Trial Tr. Vol. II at 188 (Aug. 16, 2007) (Dock. # 226); Alberty Hearing Tr. at 39, 44 (Oct. 13, 2011) (Dock. # 290).

government agents likewise did not instruct Mr. Alberty about how to conduct the conversation or what topics to discuss, nor did they direct him to ask questions at all. Id. at 26-27. According to Mr. Alberty, the only instructions he received were to "put on a wire and have lunch." Id. at 33. Mr. Alberty further testified that the conversation was "normal" and did not differ from prior conversations between him and Mr. Williamson. Id. at 31. Though they discussed prior drug trafficking activity, Mr. Alberty did not pressure Mr. Williamson to answer questions, and the two of them continued to discuss various matters while ordering and eating lunch. See id. at 29. The recording and transcript of conversation manifest no suggestion that Mr. Alberty made any kind of threatening remarks nor intimidated Mr. Williamson in any fashion. Joint Appendix at 330-370, United States v. Williamson, No. 08-4055 (Dock. # 42) (4th Cir. Nov. 26, 2008). In addition, because Mr. Alberty "worked for" Mr. Williamson's "partner," his relationship to Mr. Williamson, while friendly, was that of a subordinate to a superior. Alberty Trial Tr. Vol. II at 181 (Aug. 16, 2007) (Dock. # 226); Swaney Trial Tr. Vol. I at 20-21 (Aug. 15, 2007) (Dock. # 225); Alberty Hearing Tr. at 30 (Oct. 13, 2011) (Dock. # 290). Accordingly, it is unlikely that Mr. Alberty had any actual or perceived power over Mr. Williamson's continued presence or the statements Mr. Williamson made over the course of the conversation.

Mr. Williamson arrived at the restaurant of his own accord and left of his own free will. He was free to leave the conversation with Mr. Alberty at any point.

Although unmarked law enforcement vehicles were present near the restaurant to conduct surveillance, no law enforcement officers were present in the restaurant, nor did they seek to apprehend Mr. Williamson as he walked out of the restaurant.[3] Bryant Hearing Tr. at 9-11 (Oct. 13, 2011) (Dock. # 290).  At the time of the conversation, therefore, no police presence was visible to Mr. Williamson.  Instead, after Mr. Williamson had exited the restaurant parking lot in his vehicle, police officers set up moving surveillance while they awaited the arrival of a marked police car that would conduct a traffic stop.  Sturm Trial Tr. Vol. III at 230 (Aug. 17, 2007) (Dock. # 227).  Before that traffic stop could take place, Mr. Williamson evaded the officers and was therefore not arrested that day.  Id. at 232.

## II.

The Government introduced a tape and transcript of the recorded conversation at Mr. Williamson's trial in August 2007; counsel for Mr. Williamson did not object to the introduction of this evidence.  Mr. Williamson was subsequently convicted, and was sentenced to life in prison on December 7, 2007.  He appealed his conviction, contending that because the conversation took place post-indictment, the Government's use of an undercover informant violated his Sixth Amendment right to counsel under Massiah v. United States, 377 U.S. 201 (1964) and Brewer v. Williams, 430 U.S. 387 (1986), and that it was error to

---

[3] Though agents planned to pursue and arrest Mr. Williamson following the meeting, there is no indication that Mr. Williamson would have been detained in the restaurant.

4

allow the Government to introduce the tape and transcript of the conversation. The Fourth Circuit Court of Appeals affirmed his conviction on July 20, 2009, and the subsequent petition for hearing *en banc* was denied. Mr. Williamson then petitioned for writ of certiorari to the Supreme Court. After the Solicitor General filed a brief conceding that the Government had committed a Sixth Amendment violation under Massiah, the case was remanded to the Fourth Circuit for further hearing on the issue of whether admitting the recorded conversation into evidence was plain error. The Fourth Circuit declined to consider the Sixth Amendment issue at that time, instead remanding this case for factual findings and a determination of whether Mr. Williamson's statements were involuntary, and if the Government's actions therefore violated Mr. Williamson's *Fifth Amendment* rights. United States v. Williamson, No. 08-4055, 2011 WL 3328491 (4th Cir. Aug. 3, 2011). Specifically, the Fourth Circuit identified the following non-exclusive factors to aid the determination of whether Mr. Williamson's statements were coerced or voluntary: whether the fact that charges had been filed against Mr. Williamson "affected the degree of compulsion," "the degree of police involvement in eliciting [Mr. Williamson's] statements," Mr. Alberty's "knowledge of the impending criminal prosecutions and his relationship to" Mr. Williamson, "the nature of [Mr.] Alberty's questions and demeanor," and "the character of [Mr. Williamson's] statements and responses." Id. at *4. The parties appeared on October 13, 2011 for a hearing on this issue.

III.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND V. Although some Fifth Amendment rights apply only to custodial interrogation, see, e.g., Miranda v. Arizona, 384 U.S. 436 (1966), due process nonetheless requires that statements made in non-custodial situations be "voluntary."[4] See Dickerson v. United States, 530 U.S. 428, 434 (2000). Accordingly, the ultimate inquiry here is whether Mr. Williamson's statements were "the product of an essentially free and unconstrained choice by its maker" or if instead, "his will [was] overborne and his capacity for self-determination critically impaired." Culombe v. Connecticut, 367 U.S. 568, 602 (1961); United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc) (same).

To determine whether a statement is "voluntary," courts must assess the "totality of circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir. 1980). No factor should be considered in isolation, and the determination may not "rest solely upon any one circumstance." Id. at 1134.

---

[4] The Supreme Court has noted that its "cases have used the terms 'coerced confession' and 'involuntary confession' interchangeably, 'by way of convenient shorthand.'" Arizona v. Fulminante, 499 U.S. 279, 287 n.3 (1991) (quoting Blackburn v. Alabama, 361 U.S. 199, 207 (1960)).

6

Therefore, though "[c]oercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause," Braxton, 112 F.3d at 780 (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)), "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." Id.

The Government bears the burden of proving by a preponderance of the evidence that the statements were voluntary. Braxton, 112 F.3d at 781. Yet "[b]ecause the police activity used to elicit an incriminating statement must be coercive before a statement will be held to be involuntary, it is not surprising that 'very few incriminating statements, custodial or otherwise, are held to be involuntary.'" Id. at 786 (quoting United States v. Rutledge, 900 F.2d 1127, 1129 (7th Cir. 1990)).

IV.

The setting of the meeting between Mr. Williamson and Mr. Alberty, the details of the conversation, and the characteristics of Mr. Williamson himself reveal no ostensible coercion. Mr. Williamson is not a pliable and inexperienced individual: he had long occupied a major and supervisory role in a narcotics conspiracy. See Wertz, 625 F.2d at 1135 (no coercion in part because defendant "was not an immature or inexperienced person of limited intelligence" but was a "well-known drug dealer [who] knew well the ways of experienced criminals"). He

7

spoke voluntarily with a friend and subordinate member of his conspiracy: an individual who "worked for" Mr. Williamson's partner, and who had purchased narcotics from Mr. Williamson in the past. The conversation took place over a meal at a public restaurant, and Mr. Williamson expressed neither discomfort nor a desire to leave. See United States v. Rosen, 474 F. Supp. 2d 799, 802 (E.D. Va. 2007) (no coercion where interviews were non-custodial and took place in "comfortable, familiar surroundings," including "public places"). No law enforcement presence was apparent either inside the restaurant or in the surrounding area, and Mr. Williamson "was at liberty to terminate the discussion . . . at any time." Braxton, 112 F.3d at 781-785 (no coercion where the brief one-hour interview took place with others present, defendant could leave at will, and defendant had agreed to the meeting at the outset).

Though the fact that the setting was not custodial is not controlling, it is significant. For instance, in Wertz, the Fourth Circuit found that a defendant's statements were voluntary—even though an undercover officer had brandished his gun during a heated argument—in large part because the defendant was not in custody but was instead in a familiar area, near where he lived, and was surrounded by friends and associates:

> [U]nlike practically every other case in which involuntariness was found, [defendant] was not in custody or under arrest at the time of his admission. . . . [S]o far as [defendant] knew, his confrontation was not with a police officer, acting in the performance of his official duties, but with an illegal drug trafficker just like himself.

8

Id. at 1134; see also United States v. Kontny, 238 F.3d 815, 817 (7th Cir. 2001) ("Virtually all cases involving coerced confessions involve the questioning of a suspect who is in police custody, an inherently intimidating situation.").

Moreover, the transcript and recording of the conversation do not demonstrate that Mr. Alberty in any way threatened Mr. Williamson or coerced him into answering questions. Mr. Alberty received no direction from law enforcement about what topics to discuss with Mr. Williamson, nor was he directed to question or interrogate Mr. Williamson at all.[5] Though Mr. Alberty at times posed questions to Mr. Williamson, the conversation resembles familiar banter rather than any sort of interrogation. None of Mr. Williamson's statements exhibit unease or intimidation as a result of Mr. Alberty's conduct, nor did Mr. Williamson show any hesitancy to make incriminating statements. See, e.g., Wertz, 625 F.2d at 1135 (no coercion where there was no evidence that defendant was frightened or intimidated into speaking by the undercover officer's gun). Here, as in Illinois v. Perkins, 496 U.S. 292, 298 (1990), Mr. Williamson had "no reason to feel that

---

[5] The general question of "whether agency principles might ever be applicable or appropriate in the Fifth Amendment context" appears to be open in this circuit. See United States v. Kimbrough, 477 F.3d 144, 151 n.7 (4th Cir. 2007) (expressly reserving the question because the facts of the case before it indicated that the private questioner was acting of her own accord and not in concert with or at the direction of the police). The agency facts in this particular case, however, are controlled by Fulminante, in which the Supreme Court applied the "voluntariness" test to statements made to a jailhouse informant who was acting as an agent of the government but was not himself a law enforcement officer. 499 U.S. at 287-88 (holding that statements were involuntary where informant told defendant that defendant's life was in danger, and that in order to receive protection, defendant would need to confess).

9

[Mr. Alberty] had any legal authority to force him to answer questions or that [Mr. Alberty] could affect [Mr. Williamson's] future treatment." Indeed, the conversation "show[s] no hint" that Mr. Williamson was "intimidated" by the atmosphere, and indicates that he viewed Mr. Alberty as, at best, "an equal." See id.

In sum, based upon the circumstances and content of the January 29 conversation, the sole factor that could support a finding that Mr. Williamson's incriminating statements were involuntary is that post-indictment, he was deceived into believing that he spoke to a friend when in fact, he spoke to a government informant. As discussed below, applicable law controverts this position.

A.

Not only physical coercion but also "trickery" or "deceit" may suffice to demonstrate that a statement is involuntary. United States v. Olmstead, 698 F.2d 224, 226 (4th Cir. 1983). But because a finding of voluntariness may not rest on a single factor, Braxton, 112 F.3d at 785, the fact of trickery "must be assessed against the factual background of the accused and the interrogation." Olmstead, 698 F.2d at 226. As stated above, neither Mr. Williamson's background nor the nature of the conversation supports a finding of coercion. The fact that Mr. Williamson was unaware that Mr. Alberty was an informant therefore cannot, standing alone, justify a finding that Mr. Williamson's statements were involuntary. See United States v. Haynes, 26 Fed. App'x 123, 134 (4th Cir. 2001) ("Although

10

the officers made several false statements [to a defendant in custody] about the evidence they had obtained . . . this . . . without more, does not render an otherwise voluntary confession involuntary."); United States v. Montgomery, 675 F. Supp. 164, 172 (S.D.N.Y. 1987) ("Although [defendant] could argue that he was deceived by [informant], because her role as a government agent was not known to him, that alone does not constitute a violation of his rights.").

The extreme facts involved in the paradigmatic Supreme Court cases involving trickery or some form of mental coercion are a far cry from the facts in this case. For instance, in Spano v. New York, 360 U.S. 315, 323 (1959), the defendant was not only in custody but also was subjected to hours of late-night questioning by an old friend (and police officer) who pressured him to confess by repeatedly stating that the friend—who had three children and a fourth on the way—would lose his job if defendant did not cooperate. And in Leyra v. Denno, 347 U.S. 556, 559-60 (1954), a suspect complaining of sinus headaches was told that a psychiatrist-hypnotist was a general practitioner brought to help him with those medical problems while the suspect was detained, but who instead used leading questions to pressure the sleep-deprived suspect to make incriminating statements while in custody. In the more benign factual setting of this case, the common investigatory technique of recording a conversation through use of an informant does not implicate the same sort of Fifth Amendment concerns. Cf. Haynes v. Washington, 373 U.S. 503, 515 (1963) (discussing "secret and

incommunicado detention and interrogation" used to "extort confessions from suspects").

B.

Moreover, there is no indication here that Mr. Williamson's incriminating statements were caused by the deception. See Connelly, 479 U.S. at 164 ("Absent police conduct *causally related* to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.") (emphasis added). Mr. Alberty did not pressure Mr. Willamson to answer questions, nor—unlike the government confederates in Spano and Leyra—did he even suggest that Mr. Williamson should confess. Though Mr. Williamson has argued that he would not have made the statements if he had known Mr. Alberty was an informant, the Supreme Court "has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness." Oregon v. Elstad, 470 U.S. 298, 316 (1985). That is, though Mr. Williamson may not have spoken so freely had he known Mr. Alberty was a government informant, it does not follow that the Government's use of Mr. Alberty *compelled* Mr. Williamson to make incriminating statements. "The proper inquiry is whether the confession was '*extracted*' by the [police action],"[6]

---

[6] This concept is distinct from the "deliberate elicitation" standard applied in Sixth Amendment cases. Though the Government may violate the Sixth Amendment under Massiah, 377 U.S. 201, by directing an informer to ask questions designed to elicit an incriminating response, under the Fifth Amendment, the inquiry is not whether questions are designed to elicit a response but whether those questions "overbear the will" of the

12

Braxton, 112 F.3d at 783 (emphasis added), and that was not the case with Mr. Williamson's statements. See also Kontny, 238 F.3d at 817 ("The admission is usable in evidence against the suspect even though he would never have spilled the beans to the officer had he known the officer's status. . . . There is no right to require secrecy of the people whom one confides in.").

C.

Finally, courts have routinely rejected Fifth Amendment challenges to the government's use of informants and undercover agents. See, e.g., Kontny, 238 F.3d at 817 ("*Nothing* is more common in the noncustodial setting of police investigations than for an undercover police officer to extract a damaging admission from a criminal suspect simply by pretending to be another criminal."). When a suspect or defendant is unaware that he is speaking to a government agent, there is no inherent "compulsion" or "coercion"; in the absence of a police-dominated atmosphere, the defendant's will is unlikely to be "overborne." See Perkins, 496 U.S. at 296 ("The essential ingredients of a 'police dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. . . . Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's

---

defendant. Schneckloth, 412 U.S. at 225; see also United States v. Henry, 447 U.S. 264, 272-73 (1980) (the "Fifth Amendment claim[] made in [Hoffa v. United States, 385 U.S. 293 (1966)] [i]s not relevant to the inquiry under the Sixth Amendment here - whether the government has interfered with the right to counsel of the accused by 'deliberately eliciting' incriminating statements").

13

misplaced trust in one he supposes to be a fellow prisoner"); Hoffa, 385 U.S. at 304 (finding no Fifth Amendment violation because defendant's conversations with the informant "were wholly voluntary").

Indeed, the only case in which the Supreme Court found that statements to an informant were involuntary involved a jailhouse informant who suggested that the defendant's life was in danger from other inmates, and that the defendant must confess if he wanted protection. Fulminante, 499 U.S. at 287 (holding, over a vociferous dissent, Id. at 305-06 (Rehnquist, J.) (citing Perkins, 496 U.S. at 297), that it was a "close question" but that the statements to informant were involuntary where defendant was presented with a "credible threat" of physical violence). And Fulminante is clearly distinguishable from the facts in this case: unlike the casual, public conversation between Mr. Williamson and Mr. Alberty, the defendant in Fulminante was incarcerated and threatened with seemingly inevitable physical violence that he could prevent by confessing to his pretended protector. See id.

In short, that Mr. Williamson was arguably deceived by Mr. Alberty's role as an informant does not, in and of itself, indicate that the incriminating statements were involuntary. The question remains, however, whether in light of this strategic deception, the fact that charges had been filed somehow "affected the degree of compulsion." Williamson, 2011 WL 3328491, at *4.

V.

The only fact distinguishing this case from every other case in which courts have rejected Fifth Amendment challenges to the government's use of undercover agents or informants is that Mr. Williamson had been indicted at the time of the conversation at issue.

But whatever the significance of that fact for Sixth Amendment purposes, it does not convert an otherwise voluntary statement into a coerced confession under the Fifth Amendment. While the two Amendments can at times become intertwined, Williamson, 2011 WL 3328491, at *3, "the policies underlying the two constitutional protections are quite distinct." Rhode Island v. Innis, 446 U.S. 291, 200 n.4 (1980) (rejecting that the interpretation of "interrogation" in Fifth Amendment custodial interrogation cases should control the "deliberate elicitation" standard under the Sixth Amendment); see also Fellers v. United States, 540 U.S. 519, 524 (2004) (collecting cases distinguishing between Fifth and Sixth Amendment standards). The Supreme Court underscored this point in Henry, after the government argued that the Court "should apply a less rigorous standard under the Sixth Amendment where the accused is prompted by an undisclosed undercover informant than where the accused is speaking in the hearing of persons he knows to be Government officers." 447 U.S. at 272-73. The Court rejected that contention, commenting that such an argument "seeks to infuse Fifth Amendment concerns against compelled self-incrimination into the Sixth

15

Amendment protection of the right to the assistance of counsel." Id.; see also Montgomery, 675 F. Supp. at 170 (rejecting defendant's Fifth Amendment argument in part because "the decisions [defendant] cites for support, which hold that statements obtained by friend-informants were inadmissible at trial because the statements were obtained in violation of defendant's constitutional rights, were decided on Sixth Amendment grounds").

In the Sixth Amendment context, once the right to counsel has attached, the Government cannot circumvent the right to counsel by deliberately eliciting incriminating statements through informants: the defendant has a right to an attorney, but is more "imposed upon" because he does not know he can invoke it. Massiah, 377 U.S. at 206. While there is an independent right to counsel embedded in the Fifth Amendment, this right applies only to custodial interrogations. E.g., Miranda, 384 U.S. at 470-71. And though a confession obtained even in a non-custodial interrogation must still be "voluntary" under the Due Process Clause, because the Fifth Amendment right to counsel does not apply, by use of an informant, the Government is not "circumventing" the Fifth Amendment right to counsel. Though Mr. Williamson could argue that the Government has circumvented other Fifth Amendment rights through use of an informant, the law is clear that in the absence of official coercion or compulsion, the Fifth Amendment is not violated. See, e.g., Perkins, 496 U.S. at 297; United States v. Burton, 724 F.2d 1283, 1298 (7th Cir. 1984) ("The Constitution does

16

not protect criminal defendants from their own mistaken assumption that their peers still desire to continue their criminal activities.").

Finally, nothing about the fact of Mr. Williamson's indictment increases the likelihood of compulsion, because Mr. Williamson was not aware that he was a named defendant. See United States v. Reynolds, 762 F.2d 489, 493 (6th Cir. 1985) ("[Because] defendants were unaware of the existence of warrants for their arrest . . . their existence could not have affected how the defendants understood their position. . . . Reasonable men in the defendants' position would have felt free to leave at any time. Defendants were therefore not in custody and were under no compulsion when the incriminating statements were made."). This conclusion is buttressed by the only case in which the Supreme Court has considered the fact of indictment in the *Fifth Amendment* context: Spano, 360 U.S. 315, decided prior to Massiah. There, the Court held that the post-indictment *custodial* setting was relevant, but only in combination with the "official pressure, fatigue, and sympathy falsely aroused" after multiple failed requests to speak with an attorney, hours of repeated late-night questioning, and repeated pleas for confession from a police officer and old friend who duped the defendant into believing that his failure to confess would cause the officer his job. Id. at 323. In other words, the totality of the circumstances in Spano, rather than the indictment itself, led the Court to conclude that defendant's statements were involuntary.

Accordingly, despite Massiah's use of "imposed," 377 U.S. at 206, to

17

describe the predicament of a defendant who unwittingly gives statements to an informant when he has the right to counsel, the evidence in this case, combined with the differing scopes of the Fifth and Sixth Amendments, leads inexorably to the conclusion that the fact of Mr. Williamson's indictment does not alter the "totality of the circumstances" calculus here. Because Mr. Williamson was not in custody but instead conversed casually with an individual whom he did not know was a government agent, absent any coercive or police-dominated atmosphere, the sole fact of indictment does not render his statements "involuntary." See Perkins, 496 U.S. at 297.

V.

For the foregoing reasons, the totality of the circumstances surrounding the conversation between Mr. Williamson and Mr. Alberty demonstrates that Mr. Williamson's incriminating statements were voluntary. Accordingly, there was no Fifth Amendment violation in this case.

This the 21st day of November, 2011

                                                /s/ N. Carlton Tilley, Jr.
                                          Senior United States District Judge